# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JULIO GARCIA,                          )   1:10-CV-00542-SKO
                                       )
                                       )   **ORDER REGARDING PLAINTIFF'S**
            Plaintiff,                 )   **SOCIAL SECURITY COMPLAINT**
                                       )
       v.                              )   (Doc. 1)
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )
                                       )
_____    )

## **BACKGROUND**

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act (the "Act"). 42 U.S.C. §§ 405(g), 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 8 & 9.) On April 7, 2010, the action was reassigned to the Honorable Sheila K. Oberto for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

## FACTUAL BACKGROUND

Plaintiff was born in 1966, has a high school education from Mexico, and previously worked as a truck driver.  (Administrative Record ("AR") 87, 95.)  On March 1, 2001, Plaintiff filed an application for DIB and SSI, alleging disability beginning November 12, 1999, due to back pain.  (AR 94, 242.)

### A.   Medical Evidence and Plaintiff's Statements

On September 2, 1998, Plaintiff was involved in a car accident.  (AR 490, 502-16.)  Plaintiff was driving his truck in the course of his work when another driver fell asleep at the wheel and collided with Plaintiff's vehicle.  (AR 508-09, 514.)  Initially after the accident Plaintiff suffered no significant pain or injuries.[2]  (AR 143, 520.)

Plaintiff underwent a computed tomography ("CT") scan of his brain on September 21, 1998.  (AR 274.)  This scan showed no evidence of any fractures or any intraaxial or extraaxial fluid collections.  (AR 274.)  Plaintiff's lateral ventricles were normal in size and position, and the cotrical gray white interface was intact.  (AR 274.)  Overall, the CT scan of Plaintiff's brain on this date was considered normal.  (AR 274.)

On January 26, 2000, a CT scan was conducted of Plaintiff's lumbar spine.  (AR 166, 283.)  The CT indicated a central to left lateral disc herniation at L4-5, compression of the thecal sac, and compression of L5's exiting nerve root.  (AR 166, 283.)  This scan showed normal findings for L1-L4 as there was "no evidence of disc bulge or disc herniation."  (AR 166, 283.)

Plaintiff initiated a personal injury lawsuit as a result of the car accident, and on May 31, 2000, Plaintiff was deposed.  (AR 476-555.)  During his deposition, Plaintiff described the car accident in detail.  (AR 502-16.)  Plaintiff stated that initially after the accident only his shoulder and neck hurt, but that as time progressed he began to have pain in his head which prompted him to get "checked" with a doctor.  (AR 519-20.)  Plaintiff also stated that he had trouble using his left shoulder in certain ways, such as turning a steering wheel.  (AR 522.)  Further, Plaintiff felt

---

[2] Plaintiff signed a release and settlement agreement on July 12, 2004, satisfying his claims against the driver who collided with his truck on September 3, 1998.  (AR 442-44.)  Plaintiff received $295,000 to settle the dispute.  (AR 442.)

1    contracting pain in his neck, suffered from regular headaches, felt constant back pain, felt pain

2    throughout his left leg, and continued to have trouble with sight in his left eye.  (AR 522-41.)

3         Plaintiff began to visit Firebaugh Family Health Center ("Health Center") in April 2000 for

4    his health needs.  (AR 164-66.)  Plaintiff had a colon surgery scheduled for June 8, 2000, and during

5    the week prior, went to the Health Center for a pre-surgery check up.  (AR 163.)  On June 14, 2000,

6    Plaintiff came to the Health Center for a cough.  (AR 161.)  The notes on this date indicated "Dr.

7    Kaleka will complete disability papers," and were marked by a stamp that read "Ok'd by M.D."  (AR

8    161.)  Progress notes from June 29, 2000, stated that Plaintiff's disability forms were completed and

9    that Plaintiff needed to follow up with an orthopedic specialist.  (AR 160.)

10        Plaintiff was seen by physician's assistant ("PA") Smith at Community Medical Center on

11   September 11, 2000, regarding his back pain.  (AR 285.)  The PA noted that though Plaintiff was

12   scheduled for surgery in June, Plaintiff "decided against it in favor of trying [physical therapy.]"  (AR

13   285.)

14        On October 9, 2000, Plaintiff again visited the Health Center due to sharp pain behind his

15   left eye that was causing blurred vision.  (AR 156.)  Although the notes indicate that Plaintiff had

16   an ophthalmology consultation concerning this pain and "was told nothing [was] wrong with his

17   eye," Plaintiff still worried. (AR 156.)  On this date, Plaintiff's chronic back and neck pain were also

18   noted.  (AR 1566.)

19        Plaintiff visited Community Medical Center on November 13, 2000, due to his back pain.

20   (AR 234.)  Plaintiff indicated that his physical therapy was helping, but pain still persisted.  (AR

21   234.)  The record for this date indicates that Plaintiff's motor strength was rated five out of five.  (AR

22   234.)

23        Nurse Practitioner ("NP") Brown saw Plaintiff on November 29, 2000, reviewed Plaintiff's

24   medical history, and conducted a physical examination.  (AR 229-33.)  Plaintiff complained of pain,

25   and the NP noted that Plaintiff's pain was gradually increasing in severity.  (AR 229-30.)  Plaintiff

26   further indicated that he had been suffering blurriness in his left eye since the accident.  (AR 232.)

27   The purpose of the exam, at least in part, was to discuss surgery as a remedy to Plaintiff's pain.  (AR

28   229.)

3

On December 11, 2000, Plaintiff went to Community Medical Center to discuss the procedures for his upcoming surgery on December 15, 2000. (AR 228.) Two days later on December 13, Plaintiff's surgery was rescheduled to December 20, 2000. (AR 227.) On December 15, 2000, NP Brown prepared a preoperative history and physical report of Plaintiff, noting that Plaintiff had received "moderate relief" from his six weeks of physical therapy. (AR 143-44.) The surgery plan outlined that Plaintiff was scheduled for an L4-5 laminectomy, diskectomy, and foraminotomy. (AR 145.)

Plaintiff was admitted for surgery on December 20, 2000, at Fresno Community Hospital. (AR 140-42.) In the operating room, Steven Hysell, M.D., took an X-ray of Plaintiff's spine that showed a localizing probe posterior to L4-5. (AR 137.) The surgery was completed without complication, and Plaintiff was discharged on December 22, 2000. (AR 138-39, 141.) Upon discharge Plaintiff was doing well, but was advised to avoid heavy lifting, bending, and stooping. (AR 141.) Plaintiff's only discharge medications were ibuprofen and Tylenol. (AR 141.)

On January 3, 2001, Plaintiff was seen by NP Brown. (AR 226.) NP Brown noted that Plaintiff was still in pain and having trouble walking after his surgery. (AR 226.) On February 5, 2001, a progress note indicated that Plaintiff's motor strength was rated five out of five in all areas, but Plaintiff complained that he still had leg pain. (AR 224.) On that same day, Plaintiff's lumbar spine was X-rayed at University Medical Center in Fresno. (AR 225.) The X-ray showed no change in the appearance of Plaintiff's spine compared to a previous X-ray from 1999. (AR 225.) There were minor changes of degenerative disc disease at L2-4 and a slight narrowing of the disc at L4-5, but no fractures or dislocations. (AR 225.)

An X-ray of Plaintiff's cervical spine was taken on March 12, 2001. (AR 151.) This X-ray indicated straightening of Plaintiff's lordosis and well-maintained intervertebral disc heights. (AR 151.) The X-ray showed no fractures, lytic lesions, blastic lesions, gross facet arthropathy, or anterolisthesis, and the soft tissues were normal. (AR 151.)

On April 9, 2001, Plaintiff saw Dr. Hysell and reported left-leg pain. (AR 222.) The doctor noted that Plaintiff had no weakness and gave Plaintiff a five out of five motor strength rating in all areas. (AR 222.)

A magnetic resonance imaging scan ("MRI") of Plaintiff's lumbar spine was taken on May 10, 2001, for comparison with Plaintiff's spine CT dated January 26, 2000. (AR 210-11.)  This MRI showed "status post resection of L4-L5 disc protrusion with resolution of spinal stenosis" compared to the earlier CT. (AR 211.)  Also found were recurrent disc materials, but the significance of that finding was reduced by Plaintiff's history of left-sided symptoms, the fact that the material was small, and also by the fact that it did not "impinge on traversing neural structures." (AR 211.)

Plaintiff was authorized to have six physical therapy sessions which took place between May 10, 2001, and June 6, 2001. (AR 202, 215.)  At the end of the physical therapy regimen, the physical therapist found that Plaintiff had "essentially no change" in his range of motion or strength, noted that Plaintiff made "little to no progress with therapy," and recommended that Plaintiff follow up with his doctor. (AR 202.)

On July 2, 2001, Plaintiff filled out a daily activities questionnaire. (AR 115-20.)  In this questionnaire, Plaintiff stated that he goes to school sometimes, cooks three times a day, shops for groceries twice a month, waters plants, dusts furniture "little by little," plays with his children by drawing and painting, watches TV, reads books, goes to church weekly, and walks and sits outside with his family. (AR 115-20.)  Plaintiff also noted that he did not need help grooming, dressing, or cleaning himself. (AR 115.)  Plaintiff listed his current medications as Amitriptyline, Elavil, and Perphen Triavil. (AR 119.)

On July 19, 2001, Gail Asleson, M.D., conducted an orthopedic consultation of Plaintiff. (AR 167-71.)  Dr. Asleson opined that Plaintiff's entire cervical spine range of motion was within normal limits except for his left rotation, which was limited because of pain. (AR 168.)  Some of Plaintiff's lumbar spine range of motion was limited; Plaintiff's flexion reached only seventy of ninety degrees and his extension reached only fifteen of twenty-five degrees, but his lateral flexion was within normal limits. (AR 168.)  An examination of the range of motion of Plaintiff's upper and lower extremities showed that Plaintiff's shoulders, elbows, wrists, hips, knees, and ankles were all within normal limits. (AR 169.)  The motor strength of Plaintiff's shoulders, elbows, hips, knees, and feet were also within normal limits. (AR 170.)  Dr. Asleson opined that Plaintiff's examination was "entirely normal aside [from] symptoms suggestive of left-sided sciatica and mild decreased

1    range of motion of his back." (AR 171.)  The doctor believed that Plaintiff had the functional

2    capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently.  (AR 171.)

3           Plaintiff was examined by Dr. Hysell on September 1, 2001. (AR 199.)  At this appointment,

4    Plaintiff complained of pain in his leg, arm, and left side of his head.  (AR 199.)  Plaintiff rated his

5    pain between four and six on a scale of zero to ten.  (AR 199.)  On September 13, 2001, Plaintiff

6    visited Dr. Hysell and again complained of his pain problems.  (AR 197.)

7           On October 18, 2001, Plaintiff had an MRI of his cervical spine.  (AR 299.)  The MRI

8    showed a slight lateral disc bulge/osteophyte complex at the C3-4 level, but no significant canal

9    compromise. (AR 299.)  At the C5-6 level, there was a small broad-based left lateral high signal

10   intensity lesion which could cause encroachment of the exiting nerve roots, but no significant

11   compromise of the thecal sac or distortion of the spinal cord.  (AR 299.)  All the other levels were

12   within normal limits. (AR 299.)  On October 29, 2001, Plaintiff reviewed this MRI with Dr. Hysell

13   who explained to Plaintiff that the MRI was unremarkable and did not look clinically significant.

14   (AR 300.)  Dr. Hysell formulated a plan for Plaintiff to try more physical therapy and to discuss pain

15   management with his primary care physician.  (AR 300.)

16          An MRI of Plaintiff's cervical and lumbar spine was conducted on January 31, 2002.  (AR

17   277-80.)  Plaintiff's lumbar spine showed that the T12 through L4 levels were normal.  (AR 279.)

18   On the cervical spine MRI, levels C4-T1 showed no significant abnormalities. (AR 277.)  There also

19   appeared to be a C3-4 posterior disc bulge, but Plaintiff compromised the picture by moving during

20   the MRI. (AR 277.)  Plaintiff consequently had another MRI taken of his cervical spine the next day,

21   and the findings remained unchanged.  (AR 280.)

22          On March 18, 2002, Mythili Sundaresan, M.D., saw Plaintiff for a consultation.  (AR

23   267-70.)  Dr. Sundaresan reported her findings in a letter to Plaintiff's primary care physician, Dr.

24   Kaleka, noting that Plaintiff had normal electrophysiological findings from his lower extremities.

25   (AR 268.)  Dr. Sundaresan further opined that Plaintiff's nerves were within normal limits, but that

26   vibratory sensations were reduced in the left L4 distribution and were absent in the left S1

27   distribution, distally in his right leg, and along the ulnar distribution bilaterally.  (AR 268-70.)

28

Plaintiff also had sensory modalities, shown by impaired pinpricks throughout his right arm and leg, and on the right side of his face. (AR 330.)

Another MRI of Plaintiff's lumbar and cervical spine was taken on March 28, 2002. (AR 281-82.) The cervical spine was found to be unremarkable except for straightening of the cervical lordosis. (AR 282.) The lumbar spine was found to be normal except for minimal degenerative changes of the lumbar spine with osteophyte formation. (AR 281.)

On April 22, 2002, Dr. Sundaresan saw Plaintiff for a follow-up examination. (AR 271.) Dr. Sundaresan again reported her findings from this examination to Dr. Kaleka in a letter. (AR 271.) After reviewing Plaintiff's X-rays, the doctor opined that Plaintiff's cervical X-ray was "essentially normal," and his lumbar X-ray showed "minimal degenerative changes, primarily consisting of osteophytes." (AR 271.) An EMG/NCV of Plaintiff's upper and lower extremities was conducted, and Dr. Sundaresan opined that the test was "essentially within normal limits." (AR 271.) Dr. Sundaresan further found that there was not "anything specific for the type of [r]adicular type of pain [Plaintiff] is complaining of." (AR 271.) The doctor therefore requested that Plaintiff undergo a Myelogram with a CT scan and provide a sample of spinal fluid for evaluation. (AR 271.) Dr. Sundaresan also prescribed Plaintiff 300 mg of Neurontin for his pain. (AR 271.)

PA Manuel Ramirez, employed at the Health Center and supervised by Dr. Kaleka, assessed Plaintiff's physical capacities in a form dated June 5, 2002. (AR 258-59.) In this assessment, PA Ramirez indicated that Plaintiff could never lift more than twenty pounds, occasionally lift fifteen pounds, and frequently lift ten pounds. (AR 258.) He opined that Plaintiff could never climb, but could occasionally balance, crouch, crawl, and reach, and could frequently stoop. (AR 258.) PA Ramirez further stated that Plaintiff's pain medications made him unable to work or drive, and that overall Plaintiff could only work for two- to four-hours in an eight-hour workday. (AR 259.)

On August 27, 2002, Plaintiff saw Dr. Sundaresan for another follow-up appointment. (AR 272.) Dr. Sundaresan again reported her findings to Dr. Kaleka in a letter. (AR 272.) Dr. Sundaresan noted that Plaintiff had not kept his return appointments for the past four months. (AR 272.) Further, Plaintiff did not undergo the Myelogram or spinal tap that the doctor had requested

1   in April.  (AR 272.)  Dr. Sundaresan noted that Plaintiff still had the same symptomatology.  (AR

2   272.)

3       Dr. Sundaresan saw Plaintiff again on October 8, 2002, and once more memorialized her

4   findings in a letter addressed to Dr. Kaleka.  (AR 273.)  On that date, Dr. Sundaresan noted that

5   Plaintiff's evaluations thus far had been "essentially negative."  (AR 273.)  The doctor opined that

6   because Plaintiff was complaining of pain but there were "no obvious clinical findings or neuro

7   diagnostic findings" to explain the source of such pain, the doctor felt that there could be

8   "psychological overlay."  (AR 273.)  Dr. Sundaresan recommended that Plaintiff be referred to a

9   surgeon for treatment and evaluations or to a chronic pain clinic.  (AR 273.)

10       On January 6, 2003, Dr. Kaleka filled out a questionnaire regarding Plaintiff's physical

11   capacities.  (AR 255-56.)  Dr. Kaleka indicated that Plaintiff could never lift more than twenty-five

12   pounds, occasionally lift fifteen pounds, and that Plaintiff could both frequently and constantly lift

13   ten pounds.  (AR 255.)  Dr. Kaleka further opined that Plaintiff could never climb, balance, stoop,

14   or crawl, and could only occasionally crouch and reach.  (AR 255.)  Plaintiff was assessed as only

15   being able to walk two- to four- total hours in a workday, and sit for four- to six-hours in a workday.

16   (AR 256.)  The doctor also noted that Plaintiff was not taking any medications that would affect his

17   ability to work.  (AR 255.)

18       On January 8, 2003, Plaintiff was seen at Fresno Community Hospital for chronic back pain

19   complaints.  (AR 304.)  All of Plaintiff's tested motor functions received a four or five out of five

20   rating.  (AR 304.)  Plaintiff was referred to physical therapy.  (AR 304.)

21       On February 5, 2003, Dr. Kaleka filled out a "Lumbar Spine Residual Functional Capacity

22   Questionnaire" for Plaintiff.  (AR 237-40.)  Dr. Kaleka opined that Plaintiff had lumbar spine and

23   radioculopathy, weakness, fatigue, and chronic cervical pain.  (AR 237.)  The doctor indicated that

24   Plaintiff suffered from swelling, muscle spasms, sensory loss, muscle weakness, impaired appetite

25   or gastritis, tenderness, crepitus, and impaired sleep.  (AR 238.)  Dr. Kaleka also stated that

26   emotional factors did in fact contribute to the severity of Plaintiff's symptoms and functional

27   limitations.  (AR 238.)  According to Dr. Kaleka, Plaintiff could walk one block without rest, sit

28   thirty minutes before needing to get up, and stand only one hour at a time.  (AR 239.)  The doctor

stated that Plaintiff needed a cane or another assistive device to walk.  (AR 239.)  Dr. Kaleka found that Plaintiff could frequently carry less than ten pounds, occasionally carry ten pounds, rarely carry twenty, and never carry fifty.  (AR 240.)  The doctor asserted that Plaintiff could occasionally twist and stoop, rarely crouch, and never climb ladders or stairs.  (AR 240.)

An X-ray of Plaintiff's lumbar spine was taken on April 2, 2003.  (AR 576-77.)  This X-ray showed that L4-5 had a disc protrusion, but that the L2-4 appeared within normal limits.  (AR 577.)

On May 7, 2003, Dr. Hysell filled out a medical assessment of Plaintiff's ability to do physical work activities.  (AR 558-61.)  Dr. Hysell opined that Plaintiff could occasionally lift or carry up to ten pounds, but never more than eleven pounds.  (AR 558.)  He further noted that Plaintiff could sit for five hours in a workday, stand for three hours, and lie down for eight hours.  (AR 559.)  The doctor stated that the use of Plaintiff's hands and feet were not affected, but that Plaintiff could never climb, stoop, crouch, or crawl, and only occasionally balance and kneel.  (AR 559-60.)  Dr. Hysell found that Plaintiff was restricted in terms of heights, chemicals, noise, and humidity.  (AR 561.)

PA S. Reddig conducted a physical report of Plaintiff on May 8, 2003, and determined that Plaintiff's prognosis was good.  (AR 562.)

On May 22, 2003, an MRI of Plaintiff's lumbar spine was taken.  (AR 574-75.)  The MRI showed an interval decrease in small areas of L4-5 disc material, as compared to the MRI from May 10, 2001.  (AR 575.)  There were "[n]o specific findings worrisome for large disc herniation, central canal or neural foramen stenosis," but there was the aforementioned evidence of disc degeneration at levels L4-5.  (AR 575.)

Dr. Hysell wrote a letter on June 17, 2003, concerning Plaintiff's condition.  (AR 572.)  Dr. Hysell opined that Plaintiff was in extreme pain even though he "had an extensive workup" that showed no spinal cord compression and no herniated disk.  (AR 572.)  The doctor found that Plaintiff was in significant pain that "limit[ed] his ability to do any form of work at this time."  (AR 572.)  Further, he recommended that Plaintiff remain on permanent disability.  (AR 572.)  In July 2003, Dr. Hysell sent a similar letter to the Social Security Administration explaining Plaintiff's history of pain and treatments.  (AR 573.)  The doctor noted that Plaintiff's post-surgical MRI of the

1   lumbar spine "showed reduction of the disc herniation and post surgical changes," and that Plaintiff's

2   discogram was "nonconcordant," but nonetheless opined that Plaintiff was unable to do any physical

3   labor because of his pain.  (AR 573.)

4       On July 8, 2003, PA Ramirez wrote a letter regarding Plaintiff's condition, stating that

5   Plaintiff had "upper and lower extremity weakness with pain and chronic headaches." (AR 569.)

6   PA Ramirez opined that "Dr. Kaleka and I strongly feel that Mr. Garcia would not be a good

7   candidate to return to any type of physical work . . . and would greatly benefit from being granted

8   some type of permanent disability." (AR 569.) This letter was signed by PA Ramirez as well as Dr.

9   Kaleka. (AR 569.)

10      A medical assessment of Plaintiff's ability to do physical work-related activities was filled

11  out on December 8, 2003. (AR 563-66.) It is not clear who actually filled out this questionnaire as

12  the PA Kimberly Galbreath appears to have initially signed this form, but her signature is crossed

13  out and Dr. Kaleka's signature appears above it. (AR 566.) The assessment form indicates that

14  Plaintiff was able to both frequently and continuously lift or carry up to ten pounds, but never lift

15  eleven pounds or more. (AR 563.) Inconsistently, it also states that Plaintiff may sit, stand, walk,

16  and lie down for less than zero hours but more than one hour in a total eight-hour workday. (AR

17  564.) The form says Plaintiff "can only tolerate approximately 15 minutes in any one position before

18  having muscle cramps" which lead to fatigue and pain. (AR 564.) Plaintiff was assessed as limited

19  to occasionally grasping and manipulating with his left hand, and only occasionally using his left

20  foot. (AR 564.) Further, Plaintiff could never climb, stoop, crouch, kneel, crawl, push, or pull. (AR

21  565.) Plaintiff could occasionally reach and handle. (AR 565.) Finally, it was indicated that

22  Plaintiff should avoid all exposure to moving machinery and vibrations, and avoid concentrated

23  exposure to temperature extremes. (AR 566.)

24      On December 11, 2003, a complete physical medical report of Plaintiff was filled out. (AR

25  567-68.) Like the assessment from December 8, PA Galbreath's signature was crossed out and

26  replaced by Dr. Kaleka's signature. (AR 567.) At the top of the form, a line indicates that "Kimberly

27  Galbreath, Physician's Assistant Family Practice" completed the form with no notations by Dr.

28  Kaleka. (AR 567.) On this report, Plaintiff was assessed as having only slightly improved with pain

medications, and was given a poor prognosis.  (AR 567.)  A record noting Plaintiff's refill of his prescriptions on June 14, 2004, bears the signatures of both PA Galbreath and Dr. Kaleka.  (AR 588.)  Similarly, a letter dated June 16, 2004, was signed by PA Galbreath and Dr. Kaleka and stated that Plaintiff was unable to work due to his back pain, "neurological symptoms," and the "side effects of his medical treatment."  (AR 570.)

On June 17, 2004, Dr. Hysell wrote a letter opining that Plaintiff was in extreme pain with an unknown etiology.  (AR 571.)  Dr. Hysell recommended that Plaintiff remain on permanent disability, noting that "his condition appears to be permanent and stationary."  (AR 571.)

Medication refills for Plaintiff were noted in July and October 2004, as well as in March and July 2005.  (AR 578, 580-81, 586-87.)  As of August 2, 2005, Plaintiff was taking 300 mg of Neurontin and 75 mg of Indocin for his pain, and 200 mg of Cytotec for stomach problems.  (AR 469.)

**B.    Administrative Proceedings**

Plaintiff applied for benefits on March 1, 2001.  (AR 242-44.)  Plaintiff's application was denied initially on August 21, 2001, and again on reconsideration on December 27, 2001.  (AR 75, 81.)  On March 4, 2002, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was held on February 6, 2003, before James Berry.  (AR 38-60, 85.)  Plaintiff testified without representation, but with the assistance of a Spanish language interpreter, and a vocational expert also testified.  (AR 40, 54-58.)  On February 26, 2003, ALJ Berry rendered a decision finding Plaintiff capable of light work and therefore not disabled.  (AR 346-51.)  Plaintiff requested review of ALJ Berry's decision by the Appeals Council, which was denied on November 24, 2003.  (AR 378-83.)

On January 23, 2004, Plaintiff filed civil action entitled *Garcia v. Comm'r of Soc. Sec.,* No. 1:04-cv-5162-SMS in the Eastern District of California.  Subsequently, on January 26, 2005, the parties stipulated to remand for "further development of the record and evaluation of medical opinions," requiring the ALJ to contact Drs. Kaleka and Hysell for updated information and clarification, and to re-evaluate the medical opinions.  (AR 384-85.)  The case was remanded by the Appeals Council to ALJ Berry.  (AR 352-54.)

ALJ Berry sent letters to Dr. Hysell and Plaintiff's attorneys regarding Plaintiff's updated medical records and current condition.  (AR 470-75, 589.)  ALJ Berry held hearings on August 15, 2005, and August 8, 2006.[3]  (AR 390, 411).  On September 27, 2006, ALJ Berry issued a decision finding Plaintiff disabled since June 17, 2004.  (AR 355-65.)

Plaintiff requested review of the decision by the Appeals Council which was granted; the case was remanded and assigned to a new ALJ.  (AR 371-77, 424.)  The Appeals Council vacated ALJ Berry's finding that the Plaintiff was not disabled *prior* to June 17, 2004, and required that the newly assigned ALJ address the medical opinions of Drs. Asleson, Kaleka and Hysell, consider the opinion of "the physician's assistant,"[4] analyze Plaintiff's credibility and subjective complaints, provide reasoning and evidence for the residual functioning capacity ("RFC") assessment, and, if necessary, obtain VE testimony.  (AR 375-77.)

On November 25, 2008, ALJ Hoffman held a hearing.  (AR 591-99.)  ALJ Hoffman focused the hearing primarily on Dr. Kaleka.  (AR 593.)  Plaintiff testified that, at Dr. Kaleka's office, Plaintiff "saw the assistant, but there were times when the doctor would see [him]."  (AR 594.)  Plaintiff stated that Dr. Kaleka looked like "a short man . . . from India."  (AR 595.)

On December 3, 2008, ALJ Hoffman sent a letter to Dr. Kaleka requesting clarification regarding the doctor's medical relationship with Plaintiff.  (AR 557.)  The ALJ noted that the issue was whether Dr. Kaleka himself had actually treated the Plaintiff, pointing out some confusing notations in the medical records.  (AR 557.)  The ALJ enclosed with his letter the medical records in question, which included medical notes from April 2000 through April 2001 (AR 149-66, Exhibit 2F) as well as treatment notes from July 2004 through July 2005 (AR 578-88, Exhibit 23F).  The ALJ informed Dr. Kaleka that if the doctor did not reply within fifteen days, the ALJ would assume that Plaintiff was seen by another treating professional on the dates in question and that the treatment notes were only reviewed and signed by Dr. Kaleka, out of Plaintiff's presence.  (AR 557.)  The record contains no reply to ALJ Hoffman's letter.

---

[3] The transcripts for these two hearings are unavailable.

[4] The only physician's assistant discussed in the Appeals Council's remand decision is Manuel Ramirez, so presumably the physician's assistant being referred to here is also Mr. Ramirez.  (AR 376.)

On February 25, 2009, ALJ Hoffman rendered a partly favorable decision, finding Plaintiff disabled since June 17, 2004. (AR 318-34.) Specifically, the ALJ found that Plaintiff (1) meets the insured status requirements of the Social Security Act; (2) has not engaged in substantial gainful activity since the alleged onset date of November 12, 1999; (3) has a combination of impairments that is considered "severe" based on the requirements in the Code of Federal Regulations; (4) prior to June 17, 2004, did not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) prior to June 17, 2004, had the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours in an eight-hour workday, frequently climb and balance, and occasionally stoop, kneel, crouch, and crawl; (6) prior to June 17, 2004, was unable to perform his past relevant work; (7) prior to June 17, 2004, had the RFC to perform jobs that existed in significant numbers in the national economy; (8) on June 17, 2004, had the severity of musculoskeletal impairments to meet the requirements of section 1.04A of 20 C.F.R. 404, Subpart P, Appendix 1; and (9) became disabled on June 17, 2004, and continued to be disabled through the date of the decision. (AR 328-34.)

Plaintiff requested Appeals Council review of the ALJ's decision on April 27, 2009, asserting that the evidence indicated that Plaintiff was disabled prior to June 17, 2004, but the Appeals Council denied review on January 26, 2010. (AR 306-09, 315-17.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

## C.    Plaintiff's Appeal

On March 25, 2010, Plaintiff filed a complaint in the Eastern District of California for review of the ALJ's decision. (Doc. 1) Plaintiff only appeals the ALJ's decision with regard to the non-disability finding for prior to June 17, 2004.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial

evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the

14

requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.*

§§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant

has sufficient residual functional capacity[5] despite the impairment or various limitations to perform

her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the

Commissioner to show that the claimant can perform other work that exists in significant numbers

in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or

not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v.*

*Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

**A.   Weight of Medical Evidence**

The ALJ gave no weight to the opinions of Drs. Kaleka and Hysell and PA Ramirez. (AR

331.) Plaintiff maintains that the ALJ erred in doing so.

The medical opinions of three types of medical sources are recognized in Social Security

cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

(nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a

treating physician's opinion should be accorded more weight than opinions of doctors who did not

treat the claimant, and an examining physician's opinion is entitled to greater weight than a

non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is

uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons

for rejecting the treating physician's ultimate conclusions. *Id.*

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1          **1.**     **Evaluations from the Health Center**

2              **a.**     **Parties' Arguments**

3          Plaintiff asserts that, although some of the medical opinions from Dr. Kaleka's office were

4   prepared by medical professionals other than Dr. Kaleka, these medical professionals were all part

5   of Plaintiff's treatment team, supervised by Dr. Kaleka; any member of the treatment team should

6   thus be considered an "acceptable medical source," and their evaluations should qualify as treating-

7   source opinions.  (Doc. 14, 7:4-8:11.)  Plaintiff cites *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir.

8   1996) for the proposition that a nurse practitioner working in conjunction with a physician

9   constitutes an "acceptable medical source."

10         The Commissioner asserts that whether Dr. Kaleka (as opposed to other medical

11  professionals who he supervised in his office) treated Plaintiff was uncertain and this was a

12  legitimate basis to discount Dr. Kaleka's opinions.  (Doc. 18, 6:9-7:14.)  Further, to the extent that

13  Plaintiff asserts that other medical professionals opinions constitute acceptable medical source

14  opinions because they were part of a "treatment team" led by Dr. Kaleka, 20 C.F.R. § 404.913 – that

15  provides a list of "acceptable medical sources" – has been revised to remove any reference to an

16  "interdisciplinary team" as an acceptable medical source.  (Doc. 18, 7:15-24.)  Finally, any failure

17  to consider PA Galbreath's reports was harmless error because there was other substantial evidence

18  that underpinned the ALJ's determination.  (Doc. 18, 8:1-7.)

19             **b.**     **Analytical Framework**

20         Physician's assistants, nurse practitioners, and chiropractors (among others) are medical

21  professionals, but they are not "acceptable medical sources" under the Social Security regulatory

22  framework.  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  The evaluations of a claimant by these

23  medical professionals are considered evidence from "other sources."  *Id.*  The distinction between

24  "other sources" and an "acceptable medical source" is important because only an "acceptable medical

25  source" may be considered a "treating source."  *See* 20 C.F.R. §§ 404.1502, 416.902.  The opinions

26  of treating sources are generally entitled to controlling weight or at least deference by adjudicators.

27  *Lester*, 81 F.3d at 830.

28

There is, however, a growing recognition that the cost realities of medicine are changing and patients are increasingly treated by PAs and NPs under the supervision of a physician, rather than by the physician herself. *See, e.g., Benton v. Barnhart*, 331 F.3d 1030,1036 (9th Cir. 2003) ("HMOs achieve cost savings in part by shifting the provision of services to less costly providers, e.g., psychologists and counselors who provide services under the supervision of a psychiatrist."); SSR-06-03p, 2006 WL ("With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.").

As a result, in the Social Security context, courts are more frequently confronted with disputes as to how evaluations by other medical professionals should be weighed, whether these professionals could be considered "acceptable medical sources" under certain circumstances, and, if so, whether their opinions may be assigned "treating-source" status. As a general rule, medical evaluations of a claimant that are created and signed by medical professionals who are not considered "acceptable medical sources" under SSA regulations will not be ascribed "treating-source" status.

The United States Court of Appeals for the Ninth Circuit has carved out an important exception to this general rule in *Gomez v. Chater*, 74 F.3d 967 (9th Cir. 1996). In *Gomez*, the court held that the opinion of an NP was properly ascribed to the supervising physician and treated as an opinion from an "acceptable medical source" because the record indicated that the NP worked so closely under the supervision of the physician that she became the agent of the physician. *Id.* at 971. While the court did not provide particular examples of the type of evidence that established this agency relationship, it did indicate that the NP consulted with the physician regarding the claimant's treatment on numerous occasions. *Id.* The court also reasoned that, pursuant to 20 C.F.R. § 416.913(a)(6), "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." *Id.* The court concluded that a plain reading of paragraph (a)(6) in conjunction with the definition of "other source"

1    evidence "indicates that a nurse practitioner working in conjunction with a physician constitutes an

2    acceptable medical source, while a nurse practitioner working on his or her own does not." *Id.*

3         Since *Gomez*, district courts have interpreted this exception narrowly. *See, e.g., Ramirez v.*

4    *Astrue*, No. ED CV 09-1371-PJW, 2011 WL 1155682, at *4 (C.D. Cal. Mar. 29, 2011) (physician's

5    co-signature on client-plan prepared by a social worker did not indicate that the social worker was

6    under close supervision of the physician in treating or in preparing the reports, thus social worker's

7    evaluation was not from an "acceptable medical source"); *Vasquez v. Astrue*, No. CV-08-078-CI,

8    2009 WL 939339, at *6 n.3 (E.D. Wash. Apr. 3, 2009) (PA's report "signed off" by a superior

9    believed to be a doctor did not constitute "acceptable medical source" opinion); *Nichols v. Comm'r*

10   *of Soc. Sec. Admin.*, 260 F. Supp. 2d 1057, 1066-67 (D. Kan. 2003) (distinguishing *Gomez* where

11   physician signed the report of an NP but no evidence indicated that NP consulted with the physician

12   during the course of the patient's treatment and concluding opinion was not from an acceptable

13   medical source).

14        In application, *Gomez* does not stand for the proposition that any medical professional, who

15   would not otherwise be considered an "acceptable medical source," is transformed into an

16   "acceptable medical source" merely because he or she is supervised to any degree by a physician.

17   As a result, evaluations of a claimant prepared by medical professionals other than the physician,

18   even where the evaluation is reviewed and signed by a supervising physician, will not typically be

19   treated as evidence from "an acceptable medical source." *See, e.g., Ramirez, Vasquez,* and *Nichols,*

20   *supra.* Rather, there must be evidence of such close supervision that the "other source" becomes the

21   agent of the "acceptable medical source."

22        This interpretation of *Gomez* is consistent with the July 2000 revision to § 416.913 that

23   removed paragraph (a)(6) and any reference to an "interdisciplinary team" as an acceptable medical

24   source.  65 Fed. Reg. 34950, 34952 (July 3, 2000).  The agency explained that its revision was a

25   recognition that paragraph (a)(6) was "redundant and somewhat misleading" because acceptable

26   medical sources are individuals; thus, to be evidence from an "acceptable medical source" the report

27   or evaluation would still have to be provided and signed by the acceptable medical source regardless

28   of whether that source was part of an interdisciplinary team. *See id.*  Ultimately, this clarified the

agency's position that a report from an interdisciplinary team member who is not an acceptable medical source is not transformed into an evaluation from an acceptable medical source because of participation on the team.  Rather, to be treated as evidence from an acceptable medical source, the evaluation must be provided by an individual listed in the regulations as an acceptable medical source.  20 C.F.R. §§ 404.1513(a), 416.913(a).

The July 2000 revision to § 416.913 does not undercut the exception in *Gomez*, but it does indicate how narrowly the exception should be drawn.[6]  Only in circumstances that indicate an agency relationship or close supervision by an "acceptable medical source" will evidence from an "other source" be ascribed to the supervising "acceptable medical source."  *See, e.g., Ramirez,* 2011 WL 1155682, at *4-5; *Nichols*, 260 F. Supp. 2d at 1066.

The next question that has arisen as a natural outcropping of this supervising-physician model is whether the supervising physician's evaluation is entitled to treating-source status if that physician formulates his or her opinion on the basis of interactions and reports generated by the physician's team, e.g., nurse practitioners and physician assistants who had more direct patient contact than the physician, rather than on the basis of the physician's personal knowledge of the claimant's condition through recent examination.  This focuses not on the question whether the report is created and presented by an acceptable medical source, but instead on the nature of that opinion in light of its reliance on others who may or may not be acceptable medical sources.

In *Benton v. Barnhart*, the Ninth Circuit considered this issue.  331 F.3d 1030 (9th Cir. 2003).  In *Benton*, a claimant, Lynn Benton, began seeing a psychiatrist, Dr. Zwiefach, in November 1997, and the psychiatrist diagnosed the claimant with chronic pain and dysthemia.  *Id.* at 1034.  Dr. Zwiefach continued to manage Benton's psychiatric medications and consulted regularly with her

---

[6] While the district court in *Vasquez* was of the opinion that the holding in *Gomez* was essentially abrogated by the July 2000 revisions to § 416.913(a), this Court is not persuaded that the *Gomez* exception is a nullity.  *See Vasquez,* 2009 WL 939339, at *6 n.3  The Ninth Circuit's reasoning with regard to the NP's opinion in *Gomez* was not predicated entirely on the language of § 416.913(a)(6).  Rather, the court found that, given the facts of the case, an agency relationship had arisen between the NP and the supervising physician such that the NP's report was to be ascribed to the supervising physician himself.  The court bolstered its reasoning by pointing to the language in § 416.013(a)(6) that stated an acceptable medical source included reports resulting from an interdisciplinary team, but this was by no means the only rationale offered for the court's holding.  This view of *Gomez* is supported by the agency's explanation in revising § 416.913(a) that paragraph (a)(6) was deleted because it was "*redundant,*" and not because it represented an additional acceptable medical source that the agency was disavowing.  65 Fed. Reg. at 34952 (emphasis added).

19

treating therapists.  *Id.*  In January 1999, although he had not personally examined Benton since 1997, Dr. Zwiefach completed a Mental Residual Functional Capacity Assessment form, finding marked limitations in 11 of 20 categories and assigned her a prognosis of "very poor."  *Id.* Ultimately, the ALJ rejected this opinion, determining that there was no evidence Dr. Zwiefach qualified as Benton's treating physician because he had not personally examined Benton since 1997. *Id.* at 1035.

The court determined that Dr. Zwiefach could indeed be considered a treating physician, despite the fact that he had not personally examined Benton in over two years.  *Id.*  The court reasoned that "[o]bviously, one or more other members of that treatment other than Dr. Zwiefach had sufficient contact with Benton to qualify unequivocally as a treating source.  Dr. Zwiefach completed the mental assessment of Benton based on his assessment of information provided by those on the treatment team with more direct patient contact; the qualifications of those providing direct treatment, and the quality of their communications with Dr. Zwiefach, were either already present in the record or easily ascertainable by the ALJ."  *Id.* at 1037.  Moreover, the court explained that, "[e]ven if [Dr. Zwiefach] were not entitled to complete the Mental RFC Assessment based upon his own direct experience with a patient, nothing in the language of § 404.1502 forecloses his doing so on behalf of his treatment team.  This is not the same as evaluating Benton's case from the cold record; Dr. Zwiefach has had the opportunity to direct and communicate with the treatment team over time, and is presumably well placed to know their skills, abilities, and therapeutic techniques." *Id.* at 1039.  The court remanded the matter for renewed consideration, in light of the court's holding, of whether Dr. Zwiefach was Benton's treating physician and assessment of the weight of the opinion.

### c.    Consideration of Dr. Kaleka's Opinion

Here, the ALJ rejected the opinions of Dr. Kaleka because "Dr. Kaleka is not a treating physician and his opinions are given no weight." (AR 332.)  With regard to evaluations offered by Dr. Kaleka, the facts are analogous to *Benton v. Barnhart*.  On two occasions in 2003, Dr. Kaleka himself prepared and signed a report regarding Plaintiff's condition.  (AR 237-40, 257-55.)  His January 2003 report indicated that Plaintiff could only occasionally lift 15 pounds and could

frequently lift 10 pounds. (AR 255.) Plaintiff was never to climb, balance, stoop, or crawl. (AR 255.) Dr. Kaleka's February 2003 report indicated that Plaintiff had been treated at his clinic for over two years. (AR 237-40.) Dr. Kaleka then provided a substantive report as to Plaintiff's limitations with regard to his lumbar spine. (AR 237-40.) Like the report of Dr. Zwiefach in *Benton*, here Dr. Kaleka himself (as opposed to another medical professional in his office) prepared the January and February 2003 evaluations. Although these evaluations may have been based, to some degree, on assessments of other medical professionals supervised by Dr. Kaleka who had more direct contact with Plaintiff, Dr. Kaleka's evaluations may still be entitled to treating-source status. *See Benton*, 331 F.3d at 1039 ("Even if [Dr. Zwiefach] were not entitled to complete the Mental RFC Assessment based upon his own direct experience with a patient, nothing in the language of § 404.1502 forecloses his doing so on behalf of his treatment team."). There is also evidence that in April, August, and October 2002, Dr. Sundaresan corresponded with Dr. Kaleka regarding Dr. Sundaresan's examinations of Plaintiff. (AR 267-70, 271, 272.) This indicates that Dr. Kaleka was still employed to treat and cure Plaintiff at that time and was still involved in overseeing his ongoing treatment.

Plaintiff testified at the November 2008 hearing that, while he was examined by assistants at Dr. Kaleka's office, there were also times when the doctor himself would see Plaintiff. (AR 594.) Thus, there is evidence that Dr. Kaleka had at least some personal contact with Plaintiff, just as Dr. Zwiefach had initial contact with Benton through examination in 1997. The ALJ's refusal to give weight to any report rendered by Dr. Kaleka because it was ambiguous as to how often Plaintiff actually was examined by Dr. Kaleka, as opposed to other professionals in Dr. Kaleka's office whom Dr. Kaleka supervised or with whom he worked, was erroneous.[7] There were reports offered by Dr. Kaleka himself – an "acceptable medical source" – and the ALJ must consider whether Dr. Kaleka's opinion is to be given treating-source status under the framework provided by the Ninth Circuit in *Benton* in light of Dr. Kaleka's interactions with other professionals in his office and Dr. Sundaresan who provided more direct care to Plaintiff.

---

[7] The record contains an opinion from Dr. G. Bachir, who the index to the record identifies as a doctor from Dr. Kaleka's office. (AR 590.)

In performing this analysis, the ALJ should consider whether Dr. Kaleka, or other medical professionals supervised by Dr. Kaleka, saw Plaintiff with a frequency consistent with accepted medical practice for this type of treatment. *See* 20 C.F.R. §§ 404.1502, 416.902 ("Generally we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).").

Moreover, even if the ALJ concludes that Dr. Kaleka is a non-treating source, his evaluations are still entitled to more deference than the opinions of non-examining physicians and, to the extent his evaluations are contradicted by other evidence, they may only be rejected with specific and legitimate reasons.

If Dr. Kaleka's evaluations are entitled to treating-source status, the ALJ must give them controlling weight unless they are contradicted by other substantial evidence of record. To the extent that they are contradicted, the ALJ must give them deference unless the ALJ identifies specific and legitimate reasons not to assign them deference. As the court in *Benton* instructed, in assigning weight to Dr. Kaleka's opinion, the ALJ "may of course consider how well the treatment team operated in informing [Dr. Kaleka]." *Benton*, 331 F.3d at 1039.

### d.   Consideration of PA Galbreath's Reports

Other reports that the ALJ rejected contained the signature of PA Galbreath and Dr. Kaleka, including December 2003 reports where PA Galbreath's signature was crossed out and Dr. Kaleka's signature appears above it. (*See* AR 563-68.) These reports tend to indicate that they were prepared by the PA following the PA's examination of the claimant. As discussed above, Dr. Kaleka's signature on these reports does not transform the reports into evidence from an "acceptable medical source." The fact that Dr. Kaleka crossed out PA Galbreath's signature does not provide reliable information that the report was generated by Dr. Kaleka himself. As a result, these reports cannot be deemed to have been rendered by an "acceptable medical source," and thus they do not qualify as opinions from a "treating source" who by definition must be an "acceptable medical source." The *Gomez* exception does not apply with regard to these reports under the circumstances presented.

Plaintiff asserts that, even if these opinions were not entitled to treating-source status because they were prepared and signed by an NP, they were at least entitled to consideration as "other source" evidence.  The Court agrees.

The testimony of nurse practitioners, physicians' assistants, and non-medical sources such as spouses, parents, and friends may not be disregarded without comment.  *See Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 2003).  This is particularly true for medical sources such as nurses and medical assistants.  As noted above, SSR 06-03p explains that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  SSR 06-03p, 2006 WL 2329939, at *3 (August 9, 2006).  Ruling 06-03p also provides that opinions from these types of medical sources, "who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.*

According to SSR 06-03p, these opinions are important because, "depending on the facts in a case, after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical course' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."  *Id.* at *5.  A medical source who is not "an acceptable medical source" may be given more weight if that source has "seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."  *Id.*

As a result, it was inappropriate to disregard all the treatment records from PA Galbreath that Dr. Kaleka signed by simply stating that she was not an "acceptable medical source," and could not, therefore, be a treating source.  Rather, these reports should be considered by the ALJ, regardless that PA Galbreath, under these circumstances, cannot be considered a treating source.  This evidence is relevant to Plaintiff's condition prior to June 14, 2004, and should be considered to evaluate the extent of Plaintiff's limitations prior to that time.  It is prejudicial error to disregard significant and

1   probative evidence without comment. *See Vincent v. Heckler*, 739 F.2d 1393, 1394-95.

2   Accordingly, remand is required so that the ALJ may once again consider the opinions of Dr. Kaleka

3   as well as the evidence provided by PA Galbreath.

4            **e.**    **Consideration of PA Manuel Ramirez's Opinion**

5        Plaintiff argues that the ALJ may not reject PA Ramirez's opinion without first considering

6   it as an "acceptable medical source" under SSR 06-3p. Defendant asserts that the ALJ properly

7   discounted PA Ramirez's opinion because he is not a physician, the opinion was internally

8   inconsistent, and because the issue of disability is reserved to the Commissioner.

9        The ALJ gave no weight to PA Ramirez's opinion that Plaintiff could only stand and walk

10  for two-to-four hours in an eight-hour workday, could lift fifteen pounds occasionally and ten pounds

11  frequently, and had additional postural limitations. (AR 332.) The ALJ rejected PA Ramirez's

12  opinion for the following reasons: physician's assistants are "an unacceptable source under SSR 06-

13  03p," it "invades an opinion reserved to the Commissioner," and "the limitations set forth do not

14  preclude all substantial gainful activity." (AR 332.)

15       As discussed above, although Dr. Kaleka signed PA Ramirez's June 2002[8] report (AR 258-

16  59) as well as PA Ramirez's July 2003 letter regarding Plaintiff's condition (AR 569), a mere

17  signature does not establish that PA Ramirez worked so closely with Dr. Kaleka that his statements

18  may be ascribed to Dr. Kaleka as was the case in *Gomez*. *See Ramirez*, 2011 WL 1155682, at *4.

19  PA Ramirez is not an "acceptable medical source," and thus he could not be considered a treating

20  source. 20 C.F.R. §§ 404.1502, 416.902 (treating source means acceptable medical source who

21  provides treatment or evaluation with a frequency consistent with accepted medical practice for the

22  condition). As was the case with the reports and evaluations provided by PA Galbreath, however,

23  any reports offered by PA Ramirez are entitled to consideration as evidence provided by an "other

24  source." SSR 06-03p, 2006 WL 2329939, at *3.

25       Medical evidence provided by "other sources" may not be rejected without comment. *Turner*

26  *v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010) (testimony from social worker, an

27

28      [8] The ALJ referred to this report as a June 5, 2003, report. However, the date on the report is actually June 5, 2002. (AR 258.)

24

"other source," was considered lay testimony and could be rejected for germane reasons); *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). In considering PA Ramirez's evaluation of Plaintiff, unlike the evaluations of PA Galbreath, the ALJ provided a discussion of why weight was not afforded to the report of PA Ramirez.

The ALJ reasoned that PA Ramirez provided an opinion as to Plaintiff's ability to work, and that issue is reserved for the Commissioner, who is responsible for making the determination of whether a claimant meets the statutory definition of a disability. 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. Accordingly, the opinion of PA Ramirez that Plaintiff was not able to work is not entitled to any special consideration by the ALJ. Nonetheless, while the determination of disability is reserved to the ALJ, the ALJ must provide "arguably germane reasons" for rejecting lay witness testimony. *Lewis*, 236 F.3d at 512. This was a germane reason to reject that portion of PA Ramirez's report.

The ALJ also rejected PA Ramirez's June 5, 2002, report (*see* AR 258-59) because the restrictions reported do not preclude Plaintiff from performing sedentary work. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a).[9] Therefore, PA Ramirez's conclusion that Plaintiff was unable to do any work is in conflict with his own findings. Ultimately, the ALJ concluded that PA Ramirez's June 5, 2002, opinion was not entitled to any weight for these reasons, which were germane and specific to PA Ramirez's opinion. *See Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir. 1999) (lay testimony "provides an important source of information about a claimant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness").

The ALJ, however, did not consider PA Ramirez's July 2003 letter regarding Plaintiff's condition. (*See* AR 569.) This evidence was relevant and significant, and, as such, the ALJ must consider this evidence on remand; it cannot be discredited without comment. *See Lewis* and *Turner, supra.*

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

1          **2.      Consideration of Dr. Hysell's Opinion**

2          Plaintiff contends that the ALJ rejected Dr. Hysell's opinion based on inconsistencies with

3   the objective medical findings but did not explain how it was inconsistent and that the ALJ was not

4   qualified to find that the limitations asserted by Dr. Hysell did not preclude all substantial gainful

5   activity.   Plaintiff also argues that the ALJ was incorrect in stating that Dr. Hysell only treated

6   Plaintiff twice.  Defendant maintains that Dr. Hysell's opinion was inconsistent with the objective

7   medical evidence that the ALJ  discussed.  Defendant also argues that the ALJ's error regarding the

8   number Dr. Hysell's examinations is harmless.

9          Here, as remand is warranted for reconsideration of other medical evidence, the ALJ should

10  consider how that reconsideration impacts the weight given to Dr. Hysell's opinion.

11  **B.      Plaintiff's Credibility**

12         Because the Court has determined that this case must be remanded for the reasons detailed

13  above, the Court dispenses with an exhaustive analysis of the ALJ's credibility determination.  In

14  light of the Court's finding that the ALJ failed to properly evaluate the opinions of Dr. Kaleka as well

15  as his staff, and because credibility determinations are inescapably linked to conclusions regarding

16  medical evidence, 20 C.F.R. § 416.929, the ALJ's credibility finding should also be reversed and the

17  issue remanded.  After re-evaluating the medical evidence of record, the ALJ will be in a better

18  position to evaluate Plaintiff's credibility.  The ALJ must do more than make general findings; rather,

19  when evaluating a claimant's credibility, the ALJ "must specifically identify what testimony is

20  credible and what testimony undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d

21  968, 972 (9th Cir. 2006).  On remand, the ALJ should properly assess Plaintiff's testimony and

22  provide clear and convincing reasons for rejecting it should such a conclusion be warranted.

23  **C.      Remaining Arguments**

24         As Plaintiff's remaining arguments regarding Plaintiff's applicable date of disability onset and

25  the ALJ's application of the Medical-Vocational Guidelines necessarily involve application of the

26  medical evidence, these issues are intertwined with the ALJ's reconsideration of the medical

27  evidence on remand.   Accordingly, these issues will be considered by the ALJ on remand.

28  ///

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.   Accordingly, the Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff JULIO GARCIA, and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:**   **August 31, 2011**                                         **/s/ Sheila K. Oberto**
                                                            UNITED STATES MAGISTRATE JUDGE